## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH SIEGEL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE BOSTON BEER COMPANY, INC., DAVID A. BURWICK, FRANK H. SMALLA, and C. JAMES KOCH,<br><br>Defendants. | Case No. 1:21-cv-07693-VSB<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

page

OVERVIEW ................................................................................................................. 1

JURISDICTION AND VENUE ................................................................................... 6

PARTIES ...................................................................................................................... 7

    A.   Plaintiff ............................................................................................................ 7

    B.   Defendants ...................................................................................................... 7

    C.   Confidential Witnesses ................................................................................... 9

FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ..................... 11

    A.   The "Boom-Splat" of the Hard Seltzer Industry ........................................... 11

    B.   Defendants Mislead the Market and Reap Over $100 Million in Massive Stock Sales .... 15

    C.   The Market Learns the Truth about Truly Hard Selzer  .................................. 20

DEFENDANTS' MATERIALLY FALSE AND MISLEADING ................................ 23

STATEMENTS AND OMISSIONS ............................................................................. 23

    A.   April 22, 2021 ................................................................................................ 23

    B.   Mid-Quarter Statements ................................................................................ 30

   DEFENDANTS CONTINUE TO MAKE MATERIALLY MISLEADING STATEMENTS AND OMISSIONS TO THE MARKET AS THE TRUTH IS REVEALED .............................. 33

    A.   July 22, 2021 ................................................................................................. 33

    B.   July 23, 2021 ................................................................................................. 38

    C.   September 8, 2021 ......................................................................................... 40

POST CLASS PERIOD EVENTS ................................................................................ 41

LOSS CAUSATION/ECONOMIC LOSS ................................................................... 43

SCIENTER .................................................................................................................... 44

    A.   Insider Trading by Individual Defendants Supports a Strong Inference of Scienter ......... 45

    B.   Defendants' Admissions as to When They Knew Adverse Information About Truly That Contradicted Their Public Statements Supports a Strong Inference of Scienter ..................... 51

    C.   Additional Indicia of Scienter ....................................................................... 54

PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY .................................... 56

CLASS ACTION ALLEGATIONS ............................................................................. 56

CLAIMS FOR RELIEF ................................................................................................ 59

PRAYER FOR RELIEF ............................................................................................... 62

JURY TRIAL DEMANDED ........................................................................................ 63

## OVERVIEW

1.      Lead Plaintiff Ayhan Hassan ("Plaintiff"), on behalf of all other persons similarly situated, by and through Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters. This investigation included, but was not limited to, a review and analysis of: (i) court records; (ii) public filings of The Boston Beer Company ("Boston Beer" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (iii) transcripts and investor presentations; (iv) Boston Beer's press releases; (v) analyst reports and independent media reports regarding Boston Beer, its stock price movement, pricing and volume data; (vi) other publicly available material and data; and (vii) interviews of persons with knowledge of the allegations contained herein, including former employees of Boston Beer and relevant third parties. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants (defined below) and/or are exclusively within their custody or control. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after further investigation and after a reasonable opportunity to conduct discovery.

2.      Plaintiff brings this securities class action on behalf of persons who purchased the securities of Boston Beer between April 22, 2021 and September 8, 2021, inclusive (the "Class Period"); against Boston Beer, Chief Executive Officer David A. Burwick ("Burwick"); Chief Financial Officer Frank H. Smalla ("Smalla"); and Founder and Chairman C. James Koch ("Koch") (collectively, "Defendants"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

1

3.      Boston Beer and its subsidiaries are engaged in the business of selling alcoholic beverages including craft beer, hard seltzer, hard iced-tea, hard cider, and other similar beverages. The Company's revenue grew exponentially in 2019 and 2020, due in large part to the meteoric rise in popularity of hard seltzer and the success of Boston Beer's Truly Hard Seltzer ("Truly").

4.      By early 2021, however, the hard seltzer market began facing headwinds that slowed its growth.  For example, as restrictions put in place during the Covid-19 pandemic were lifted, alcohol consumers began to once again frequent bars and restaurants instead of drinking at home, where hard seltzers were most widely consumed.

5.      However, on April 22, 2021, the start of the Class Period, Defendants told investors that these market conditions had not impacted Truly. In fact, Boston Beer *raised* its 2021 guidance on the shoulders of Truly demand, representing to investors that Truly brand growth had "accelerated" and that they expected to "continue this positive momentum" in the next quarter. Even though multiple analysts raised the issue of negative seltzer trends during the question and answer session of the April 22 earnings call, Defendants assured the market that Truly was continuing to grow notwithstanding the headwinds, which caused analysts to dramatically raise their outlook for Boston Beer's stock.  The following day, April 23, 2021, the stock price opened at its highest ever price – $1,338 per share, a 5.5% increase over the opening price the day before.

6.      In conferences and interviews in May and June, Defendants Koch and Burwick made additional public statements reiterating their bullish stance on Truly, which maintained investor expectations and kept the stock price inflated.

7.      Meanwhile, as Boston Beer's stock was bloated with artificial inflation, Individual Defendants Koch and Burwick unloaded massive amounts of Company stock, collectively reaping well over *a hundred million dollars* in proceeds.

8.      Then, on July 22, 2021, after the market closed, Boston Beer stunned the public by dramatically reducing its full year 2021 guidance, in large part because it had "overestimated the growth of the hard seltzer category in the second quarter." On this news, the Company's share price cratered, falling an astonishing $246.54, or *26%*, to close at $701.00 per share on July 23, 2021, on unusually heavy trading volume.

9.      During the Company's earnings call on July 22, 2021, Bonnie Herzog of Goldman Sachs said, "I don't maybe even know where to begin…I'm truly struggling and yes, pun intended, with how meaningfully your results have deteriorated? I guess I'm saying this because even as recently as May, your tone and comments suggested that even with a slowdown in the category you could still deliver relatively strong growth and hit your full year guidance."

10.     The next day, on CNBC's Closing Bell, Defendant Burwick was asked an even more pointed question: "25% drop in the share price highlights the scale of difference in performance today relative to what the investment community's expectation was, and I guess the question there is at what stage during the past quarter, I mean, Jim Koch was on with us three months ago – he could not have been more positive about Truly and clearly something has happened different from how you guided, from the tones you put out before, including mid-quarter at various conferences – when did you realize that things had slipped behind expectation, and why wasn't there, sort of, more guidance along those lines to the investment community?"

11.     Defendant Burwick conceded it was a "fair question," and said that the Truly slow down "hit us" around May when the country began to open back up and people began to return to bars and restaurants, where hard seltzer had not yet gained traction.

12.    This explanation differed from what CFO Smalla told investors during the July 22 earnings call, when he explained that, far from a surprise to management, "we were *expecting* a slowdown in May and June" of Truly shipments and depletions.

13.    Even accepting Defendant Burwick's characterization that management was surprised by a sudden slowdown of Truly sales in May of 2021, his own statements during an interview with Beer Business Daily on June 24, 2021, a full month later, gave absolutely no indication of those headwinds.  In fact, Evercore analyst Eric Serotta, who followed Boston Beer extensively, wrote a Flash Note that same day reflecting on Burwick's interview, noting that "Burwick remains highly confident in Truly's growth prospects, and also provided some additional color about recent performance, on-premise, and supply." Based on the comments, Evercore "continue[d] to expect the hard seltzer category [to] accelerate," maintained its "Outperform rating on SAM," and set a target share price of $1,600.

14.    Nevertheless, Defendants assured the market after the July 22 revelations that, while the Company had hit a bump in the road, Truly was still growing and Boston Beer expected to meet its revised forecasts for the rest of the year. For example, Defendant Koch stated: "[w]e remain highly positive about the future growth of our brands and that our diversified brand portfolio continues to fuel double-digit growth." Burwick added, "[b]ased on the brand's innovation leadership, strong brand building and growing cultural relevance, we believe Truly is well positioned to continue to grow share."

15.    But then, on September 8, 2021, after the market closed, Boston Beer withdrew its 2021 financial guidance completely, citing decelerating sales of hard seltzer products. The Company also stated that it "expects to incur hard seltzer-related inventory write-offs, shortfall fees payable to 3rd party brewers, and other costs" for the remainder of fiscal 2021.

16.     On this news, the Company's share price fell $21.09, or 3.7%, to close at $538.31 per share on September 9, 2021, on unusually heavy trading volume.

17.     Defendants would later admit that they already knew that Truly demand had fallen way off the mark at the time of their July 22, 2021 earnings call, when they offered investors comforting assurances that their internal numbers supported their revised production guidance. Specifically, on the Company's October 21, 2021 earnings call, Defendant Burwick admitted that it was in at least "June and July 2021 when the category started to decelerate rapidly…."

18.     The next day, on October 22, 2021, Defendant Koch explained in an interview on CNBC's "Closing Bell"[1] that Boston Beer had destroyed "millions of cases" of Truly, literally dumping millions of dollars in inventory down the drain. "We were very aggressive about adding capacity, adding inventory, buying raw materials like cans and flavors, and frankly we overbought," he stated, "and when the growth stopped, we had more of all those things than we were going to be able to use, because there is a shelf life. We want Truly to have that fresh, bright taste, so we're gonna crush – uh – millions of cases of product – um – before it goes stale."

19.     While Defendants attempted to characterize their guidance failures as simple corporate mismanagement with statements such as "we don't look very smart," and "frankly, we overbought," the reality is that Defendants' Class Period conduct resembled the classic pump and dump scheme.  The Individual Defendants' prolific sell-off of Company stock in the short window of time in the wake of a guidance raise and before Boston Beer revealed a drastic reduction of that guidance – coupled with the Company's own admission that Boston Beer knew that Truly demand had fallen short in the spring and summer – demonstrates that these insiders knew that the hard

---

[1] https://www.cnbc.com/video/2021/10/22/boston-beer-ceo-hard-seltzer-wasnt-gonna-grow-forever-and-frankly-we-overbought.html

seltzer market had changed, demand for Truly was decelerating, and the Company would fall short of their guidance.

20.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities that resulted therefrom, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

21.     The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. §78aa).

23.     This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information and the solicitation of purchasers of Boston Beer securities, occurred in substantial part in this Judicial District.

25.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## PARTIES

### A. Plaintiff

26.     Lead Plaintiff Ayhan Hassan, as set forth in the accompanying certification attached hereto at Exhibit A, incorporated by reference herein, purchased Boston Beer securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

27.     Defendant Boston Beer is incorporated under the laws of Massachusetts with its principal executive offices located in Boston, Massachusetts. Boston Beer's Class A common stock trades on the NYSE under the symbol "SAM."

28.     Defendant David A. Burwick was the Chief Executive Officer ("CEO") of Boston Beer at all relevant times. As CEO, Burwick participated in quarterly earnings calls, investor and industry presentations, and media appearances and signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") attached to Boston Beer's financial statements. From the beginning of the Class Period through the first corrective disclosure, Burwick sold a large amount of Boston Beer stock, for proceeds of approximately $11 million.

29.     Defendant Frank H. Smalla was the Chief Financial Officer ("CFO") of Boston Beer at all relevant times. As CFO, Smalla participated in quarterly earnings calls and other investor presentations and signed SOX Certifications attached to Boston Beer's financial statements and other SEC filings.

30.     Defendant C. James Koch is the founder of Boston Beer and was the Company's Chairman of the Board of Directors ("Chairman") at all relevant times. In this capacity, Koch participated in quarterly earnings calls, industry conferences, and media interviews on behalf of

the company, and is quoted in a number of press releases published by Boston Beer. As reported in each of Boston Beer's 10-Ks, Koch also owned 100% of the Company's Class B shares, allowing him to "exercise substantial influence overall matters requiring stockholder approval" and making "most material transactions difficult or impossible to accomplish without the support of Mr. Koch." From the beginning of the class period through the first corrective disclosure, Koch sold a massive amount of Boston Beer stock for proceeds of ***approximately $104.4 million***.

31.     Defendants Burwick, Smalla, and Koch (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

32.     Boston Beer, Burwick, Smalla, and Koch are referred to collectively as Defendants. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

**C. Confidential Witnesses**

33.     Confidential Witness ("CW") 1 worked at Boston Beer in sales related positions from January 2017 until the end of August 2021.  CW1's most recent position, from May 2020 to August 2021, had been as a District Manager in Northern California. CW1 met Defendant Burwick on several occasions when he and CW1's supervisor, the Division Manager, toured and visited Boston Beer's wholesalers the area. CW1 explained that in the United States, alcoholic beverage companies like Boston Beer cannot sell directly to on- or off-premise customers, instead, sales must be made to a wholesaler (also known as a distributor), which in turn sells to the on- and off-premise customer accounts, who then sell to consumers. The wholesaler CW1 worked with was the beer division of Reyes Beverage Group, the largest beer distributor in the United States.[2] CW1 said that in 2019-2020, Boston Beer's sales had "skyrocketed" in California because of Hard Seltzer and Twisted Tea.  As CW1 recalled, Boston Beer had had a big launch of hard seltzer lemonade in 2020 which had performed really well.  The company sought to follow this success by launching Truly Iced Tea in January 2021, the sales of which, according to sales initiatives CW1 received from management, "needed to be equal" to the 2020 hard seltzer lemonade sales.

34.     Prior to 2021, the Company's philosophy had been "the right beer, the right account," however, in 2021 the approach shifted to "get everywhere at all costs." CW1 stated that Boston Beer began "pushing the wholesalers hard" to take on increased volumes. CW1 was forced to break the distribution chain and go to remote locations, like the small town of Maryville, CA, where the wholesaler refused to go to try and sell the Boston Beer products, even though such towns were not Truly accounts and unlikely to be so. Boston Beer then announced another new product launch, Truly Punch Hard Seltzer. CW1 recalls that employees were given notice of this

---

[2] *See* https://reyesbeerdivision.com/who-we-are

new product launch literally about 10 minutes before the Company announced it to the public via press release. However, CW1 recalled that at a certain point "sales just stopped." By May 2021, sales of Truly had slowed, and Truly Iced Tea was not selling.  And by mid-Summer 2021, sales of all product types had slowed because there was "too much" product had been shipped and it was simply "not moving fast enough."  According to CW1, Boston Beer had wanted 90% of breweries in the Northern California region to carry Truly but this simply couldn't be done because the market was not there.  As CW1 put it, there were always going to be some accounts that did well, but others simply would not because the product was not right for those accounts.  Ultimately, CW1 called her boss question why she should be focusing on these accounts that were unlikely to support Truly sales. Around July 2021, the stress of this situation caused CW1 to "mentally check out," and soon after, CW1 left the Company.

35.     CW2 worked for Boston Beer for approximately 15.5 years, holding a number of positions, and was Senior Business Program Manager & Process Improvement Lead – Operations & Supply Chain (a role that related to the IT systems and processes that supported supply chain) from September 2014 to March 2021, at which time CW2 left the company to pursue other opportunities. CW2's direct supervisor reported to Defendant Smalla. CW2 stated that Boston Beer had basic systems to handle day-to-day operations, but no long-range forecasting capabilities because they lacked the systems and personnel necessary to support such functions. According to CW2, Boston Beer lacked a dedicated forecasting team, and the Company's forecasting and demand planning hardware and software had been insufficient starting "many business cycles" prior to 2021, particularly for "downside modeling." CW2 and other members of the process team made the case to senior management multiple times that improvements to the system were necessary, but management, particularly Defendant Koch, "stymied" these initiatives. Instead,

CW2 stated, the Company's forecasting and demand planning functions were based on nothing more than how the executives said the business was going to perform, not on actual demand.

## FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

36.     Boston Beer and its subsidiaries are engaged in the business of selling alcoholic beverages including craft beer, hard seltzer, hard iced-tea, hard cider, and other similar beverages. The Boston Beer Company was founded in 1984 by Defendant Koch, who brewed the first batch of Samuel Adams Boston Lager himself. Now, the Company maintains a brewery in Boston, Massachusetts, and has additional facilities in Cincinnati, Ohio, and Lehigh Valley, Pennsylvania. In addition to its classic Sam Adams Lager, Boston Beer also owns such brands as Angry Orchard Cider, Twisted Tea, Dogfish Head, and Truly Hard Seltzer.

### A.  The "Boom-Splat" of the Hard Seltzer Industry

37.     Back in October 2019, the Los Angeles Times published an article on the hard seltzer industry.[3] Social media termed the summer of 2019 "White Claw Summer," and the internet exploded with memes, Instagram photos, YouTube videos, and merchandise featuring the hard seltzer, including t-shirts, banners, and even Halloween costumes. *Id.* The article wondered– was this success a temporary fad or would consumer demand remain for the long term? The publisher of a beer industry trade magazine explained that the arc of a fad is "often referred to as the boom-splat syndrome, where a new product makes a big splash and then kind of disappears or recedes." *Id.* The article concluded that "[o]nly time will tell" if the hard seltzer industry "is destined to go splat as well." *Id.*

---

[3] *See* https://www.latimes.com/business/story/2019-10-20/white-claw-hard-seltzer-fad-or-here-to-stay

38.     The popularity of hard seltzers has skyrocketed in recent years.[4] Hard seltzers are carbonated, light in flavor, and low in alcohol compared to mixed cocktails, and thus appeal to beer, wine, and spirit drinkers. Hard seltzer is also gluten free and low in calories compared to other alcoholic beverages, and thus appeal to more health-conscious individuals.[5] The number of hard seltzer brands on the market went from 10 in 2018 to 65 in mid-2020, to about 200 in mid-2021.[6] The chart below compares percentages of total alcohol sales across different categories in 2017 versus 2021.[7]



Total Alcoholic Beverage Sales   GLENVIEW TRUST, THE NIELSEN COMPANY, COWEN AND COMPANY

---

[4] *See* https://www.vox.com/the-goods/2019/8/20/20812814/white-claw-truly-hard-seltzer-explained

[5] *See* https://daily.sevenfifty.com/whats-fueling-the-rapid-growth-of-hard-seltzer/

[6] *See* https://nielseniq.com/global/en/insights/analysis/2020/hard-seltzer-defies-categorization-and-limits-as-the-most-resilient-alcohol-segment-in-u-s/

[7] *See* https://www.forbes.com/sites/bill_stone/2021/09/21/the-investment-implications-of-hard-seltzer-losing-its-fizz/?sh=45219bc34b49

39.     By mid-2019, Truly, the hard seltzer owned by Boston Beer, had the second largest market share in the hard seltzer space, behind only consumer favorite White Claw, owned by Mark Anthony Brand.[8] Some even referred to White Claw and Truly as "the Coke and Pepsi of the industry."[9] The chart below depicts U.S. market share of various companies in the hard seltzer market in September 2021.[10]



U.S. Hard Seltzer Market Share   GLENVIEW TRUST, BLOOMBERG

40.     Market analysts highlighted one potentially adverse trend in the hard seltzer industry. As Market Research firm TrendSource explained in 2019:

> hard seltzers . . . are still predominately an at-home type of beverage, one that consumers buy from retailers in grocery and liquor stores; they have yet to penetrate deeply into the bar and restaurant segments. Securing a seat at the bar is important.[11]

---

[8] *See* https://www.vox.com/the-goods/2019/8/20/20812814/white-claw-truly-hard-seltzer-explained

[9] *See* https://www.businessofbusiness.com/articles/history-of-hard-seltzer-white-claw-truly-bud-light-cacti-comparison-travis-scott-constellation/

[10] https://www.forbes.com/sites/bill_stone/2021/09/21/the-investment-implications-of-hard-seltzer-losing-its-fizz/?sh=45219bc34b49

[11] http://trustedinsight.trendsource.com/trendsource-trending/beverage-industry-cpg-market-research-hard-seltzer-riding-that-summertime-magic

However, soon after this report was written, the Covid-19 pandemic forced many bars to close.

41.     The Covid-19 pandemic greatly increased demand for hard seltzer. While March 2020 saw an almost immediate 80-90% decline in alcohol sales at bars and restaurants, "off-premise" alcohol sales grew rapidly. In a report on the effects of the Covid-19 pandemic on the food and beverage industry, advisory firm Bakertilly noted:

> In the pre-COVID weeks of 2020 (approximately 11 weeks) there was a total of $4.5 billion in total off-premise alcohol sales. Then, March hit. From the week ending March 7, 2020 through the week of May 16, 2020, off-premise alcohol sales ballooned to $19 billion.[12]

Analytics firm Neilson similarly noted an uptake in retail alcohol sales generally starting in March 2020.[13] In an article titled, "Cheap booze, hard seltzer sales spike during COVID-19," Danny Brager of Nielsen's beverage/alcohol practice, is quoted as saying that, due to the pandemic, "Consumers are shifting the dollars they would have spent on alcohol in a restaurant, bar, or tasting room to alcoholic beverages they can buy at a lower mark-up from retailers."[14] The shift to purchasing alcohol "off-premise" highly favored light beer and hard seltzer.[15]

42.     Predictably, the trend of primarily drinking at home was only temporary. In the first few months of 2021, as the Covid vaccine became more widely available, restrictions lifted and restaurants and bars began opening again. Consumers migrated back to their old haunts and began purchasing less alcohol at grocery stores. Sales of hard seltzer steeply declined – the very "splat" the Los Angeles Times had warned of back in October 2019.

---

[12] *See* https://www.bakertilly.com/insights/checking-food-beverage-industry-during-covid-19

[13] *See* https://nielseniq.com/global/en/insights/analysis/2020/hard-seltzer-defies-categorization-and-limits-as-the-most-resilient-alcohol-segment-in-u-s/

[14] *See* https://www.yahoo.com/now/cheap-booze-hard-seltzer-sales-202558687.html

[15] *See* https://www.yahoo.com/now/cheap-booze-hard-seltzer-sales-202558687.html

**B.  Defendants Mislead the Market and Reap Over $100 Million in Massive Stock Sales**

43.    From 2019 through early 2021, the rapid expansion of the hard seltzer category contributed to a massive growth in Boston Beer's revenue. Boston Beer's first quarter 2021 ("1Q:21"), for the period ended March 27, 2021, revenue was reported to be approximately $582 million, compared to $352 million for the same quarter in 2020 and $267 million in 2019. In other words, the company's revenue more than doubled in just two years. Because this success was largely due to increased Truly sales, Defendants began spending larger and larger amounts of money on production facilities and materials to produce the hard seltzer. They even signed a two-year contract with Grammy award winning pop star Dua Lipa to be the face of their new campaign, titled "No One Is Just One Flavor."[16]

44.    However, as bars and restaurants began opening in early 2021, sales began to plateau. Nevertheless, Defendants continued to ship massive amounts of Truly to its distributors. As indicated in their Q1:21 10-Q, "shipment volume for the quarter was significantly higher than depletions volume." In other words, Boston Beer was shipping distributors more product than consumers were buying (*i.e.*, depleting). This resulted in distributors having seven weeks of inventory on hand, a perilously high amount given Truly's nine-month shelf life.

45.    The practice of continuing to increase excess levels of inventory in a distribution channel without corresponding demand is known as "channel stuffing," and recognizing revenue on such sales is contrary to Generally Accepted Accounting Principles ("GAAP"). Channel stuffing is most often seen towards the end of an accounting period in order to inflate sales, and thus revenue, for the period. A December 2010 *Wall Street Journal* article about Boston Beer's 2010 earnings explained channel stuffing:

---

[16] *See* https://www.cnn.com/2021/05/19/business/dua-lipa-truly-hard-seltzer-sponsorship/index.html

> An old accounting gambit is to sell tons of stuff to distributors (channel stuffing) and declare the sales gains. This, of course, is not a good long-term strategy, but it can work for a bit. Depletions are the sales that are taking place from the distributor to the retailer. So, when depletions and shipments are in line, that means, in theory, the channel isn't getting stuffed.[17]

The fact that Boston Beer's shipments were "significantly higher" than depletions in Q1:21 suggests that the Company engaged in channel stuffing in order to inflate its quarterly revenue.

46.     CW1's statements regarding the Company's frenzied directive to "get everywhere at all costs" and to push wholesalers to take on more inventory, even in locations that they knew were not suitable for Truly, and despite slowing sales, further suggests that Boston Beer engaged in channel stuffing in the first quarter of 2021.  Indeed, CW1 explained that the Company's approach to sales during Q1:21 was very different from the "constructive sales" approach it had always used, when Boston Beer always preached "the right beer, right account."  Instead, during the quarter, CW1 described the shift as the Company "standing on the neck of the wholesaler" to force them to purchase Truly for which there was insufficient demand, even to the point where the wholesaler pleaded with CW1 to help them sell the product.

47.     Further, CW1 explained that the Company tracked wholesaler inventory with daily inventory reports and "trend reports," and could see what the wholesale was selling on a daily basis and to whom (grocery stores, convenience stores, multi-outlets, etc.). CW1 said that it was clear that sales to the off-premise accounts in 2021 were less than 2020, and that there was "too much inventory."

48.     Further, since distributors had the maximum amount of inventory, and sales were slowing, Defendants knew at that time that their forecasts for the next quarter and the remainder of the year would not be feasible, yet, instead of lowering their guidance, Defendants actually

---

[17] *See* https://www.wsj.com/articles/BL-MB-30403

*raised* it. In an earnings call on April 22, 2021, Defendant Burwick stated: "given the trends for the first 3 months and our current view of the remainder of the year, *we've adjusted our expectations for higher 2021 full year volume and earnings growth*, which is primarily driven by the strong performance of our Truly and Twisted Tea brands." (emphasis added).

49.     As CW2 explained, this forecast was not based on actual demand, which had already slowed, because at best the Company's hardware/software could only handle day to day functions, and was incapable of performing longer projections.   Rather, according to CW2, forecasts were based solely on management's representations. At bottom, Defendants lacked any support for their assertions that Truly's market share would continue to grow and outpace the category, yet based on these faulty assumptions, they misleadingly raised their guidance for 2021.

50.     At the same time, growth in household penetration – *i.e.*, the number of households reached by a product – was slowing. In a panel interview with Brewbound in May 2021, when asked whether new customers or brand loyalty was more important, Defendant Burwick stated:

> *I worry a lot more about recruiting new drinkers than I do about loyalty*, because that's where your growth is going to be, it's always going to be with new consumers who come in. Because every brand has a leaky bucket, and the question is how quickly can you fill that bucket. I think, typically in the world of CPG, it's all about bringing in new consumers, so for us it's about awareness, trial, execution in the marketplace, availability in the marketplace, getting into people's shopping carts, getting into their hands, really independent of whether they've purchased us before or not. (emphasis added).

51.     After the explosive growth of the hard seltzer industry in 2019 and 2020, the number of potential new customers plateaued. As CW1 experienced in her trip to Maryville, CA, some places were just not going to embrace hard seltzer. This was already starting to happen in Spring of 2021.

52.     Analysts and market researchers were aware of the negative trends for the hard seltzer industry generally, and asked Defendants if they had taken the trends into account during

the April 22, 2021 earnings call. Defendants assured the analysts that they had considered these trends when making their forecasts and were still confident in Truly's growth.

53.     For example, an analyst from Cowen and Company asked, "with the growth in the hard seltzer category **having decelerated notably since March**, can you all offer an updated view on full year growth for the hard seltzer category?" (emphasis added). Burwick responded:

> **we still think the category is going to grow significantly** . . . the consumer trends are still there, right? So you drive for health and wellness, for [IDCP], premiumization, they're still there, they're still evident. The shelf space thing is a big one, and we expect the category is going to gain probably 30-plus-percent shelf space . . . there's a lot of reasons why we believe that category will actually now start to reaccelerate, and that's part of our calculation. (emphasis added).

54.     A Goldman Sachs analyst asked, "just thinking about bars and restaurants opening up, I guess there's a bit of a view that this could negatively pressure the hard seltzer category. So I'd love to hear maybe a little more thought on this and what you see as the real opportunity for seltzers on-premise?" To which Burwick responded:

> We're seeing a lot of growth right now, definitely bar calls out there for the hard seltzer brands. And our on-premise team has been out actively selling and making a lot of progress on driving distribution within that channel. So we feel very optimistic that we're going to have a lot of Truly in the category in general.

55.     A Jeffries analyst questioned why Defendants felt confident enough to increase their guidance "given the flood of competition and the amount of investment that's coming into space." Burwick responded:

> **[W]e're going to plate the entire year to grow share**. So it's one thing to -- again, the category grows 60 to 90. Honestly, whatever it is, **we're going to grow faster**. That's what's happening and as the category grows 50 and we grow 70; [indiscernible] grows 90, we grow 110 going forward. But we believe, with the innovation we have lined up, and by the way, the brand investments, which is significant -- and a lot used to come -- still to come on the brand, **we feel like we've been lit and lined up to withstand the competition, as good as they are**. (emphasis added).

56.     However, in the weeks leading up to this statement, Truly was not consistently gaining market share.  According to market share calculations by Evercore, Truly's market share rose from 26.4% the week of January 10, 2021, the first week after the launch of Truly Iced Tea Seltzer, to 30.3% the week of March 14, 2021. That week, White Claw released a competing Iced Tea seltzer, and Truly's market share began to consistently decline, dropping down to 25.1% the week of April 22.

57.     As Burwick himself explained, the seltzer market was not about brand loyalty, it was about popularity. For hard seltzer, market share data demonstrated that the consumer always wanted the newest and hottest product. When asked in an April 23, 2021 interview during "First on CNBC," "how many more versions of Truly can you add?" Defendant Koch answered that with the launch of its punch-flavored Truly, they were "close to a full suite" of Truly offerings.  With even more new entrants, such as Cacti, Topo Chico, and Michelob Ultra, to this hyper-competitive seltzer category, and with no new flavor innovations on the horizon, Defendants simply had no means of growing market share and outpacing category growth.

58.     Defendants' materially false and misleading statements in the Q1:21 earnings call artificially inflated the stock price. In fact, on April 23, 2021, intra-day, the stock reached the highest price in its history – $1,350 per share – on unusually heavy trading volume.

59.     Defendants continued to make materially false and misleading statements in various industry conferences and media appearances throughout the months of May and June, 2021. For example, Defendant Koch gave a keynote presentation at the 2021 Beverage Forum, in which he stated that, despite decelerating growth overall in the hard seltzer category, Truly had "been gaining [market] share for – like – a year and a half" and that management expected it to continue to gain market share in 2021. And on June 24, 2021, Defendant Burwick, in an interview

with Beer Business Daily, stated that Truly's sales were "growing in the high double digits" and that management was "confident in Truly's ability to grow significantly despite the recent segment slowdown." Due to the artificial inflation from these statements, the stock price remained over $1,000 per share most days during these months.

60.     However, according to CW1, by May 2021 sales of Truly had already slowed, as wholesalers had taken on too much inventory and it was "not moving fast enough." Defendant Smalla later admitted that the Company was expecting a slowdown in May and June, 2021, and Defendant Burwick later stated that by Memorial Day, 2021, the Company had already seen a steep decline in Truly's growth.

61.     During this time, Defendants Koch and Burwick sold large amounts of stock. Defendant Burwick sold approximately 9,240 shares for proceeds of approximately $11 million. Defendant Koch sold stock almost daily (in fact, almost hourly) over the months of May, June, and early July, 2021 – a total of over 500 individual transactions. In total, he sold over 100,000 shares for proceeds of approximately $104.4 million.  Defendant Koch, who only had one stock sale in 2021 prior to the release of Boston Beer's Q1:21 financial reporting and earnings call, and stopped these daily stock sales after July 8, 2021. He has not sold any more stock since that time.

**C.  The Market Learns the Truth about Truly Hard Selzer**

62.     On July 22, 2021, after the market closed, Boston Beer reduced its full year 2021 guidance, expecting earnings per share between $18 and $22, down from a prior range of $22 and $26. The Company cited softer-than-expected sales in the hard seltzer category and overall beer industry and stated that it had "overestimated the growth of the hard seltzer category" in the second quarter of 2021 ("Q2:21"). Defendants listed a number of reasons why sales of hard seltzer were softer than expected, including the very concerns analysts had raised in the Q1:21 earnings call:

"slowing growth in household penetration"; "a gradual transition of volume to the On-Premise channel"; and "new hard seltzer brands at retail that resulted in a proliferation of choices and consumer confusion." Burwick told CNBC that, after such a big miss, Boston Beer management does not "look very smart."[18]

63.     On this news, the Company's share price fell $246.54, or 26%, to close at $701.00 per share on July 23, 2021, on unusually heavy trading volume.

64.     Stock analysts grilled Defendants after the news, asking how the Company had so dramatically missed on its results after they had so recently offered such glowingly positive statements about Truly in the face of known headwinds.

65.     For example, during the Company's earnings call on July 22, 2021, Bonnie Herzog of Goldman Sachs stated:

> I don't maybe even know where to begin.  I understand that the category has been flowing, everyone is aware of this. That said, I'm truly struggling and yes, pun intended, with how meaningfully your results have deteriorated? I guess I'm saying this because *even as recently as May, your tone and comments suggested that even with a slowdown in the category you could still deliver relatively strong growth and hit your full year guidance*. So I guess for me this begs the question. How confident are you that you're going to be able to hit your guidance, and really how much visibility do you have in your business? (emphasis added).

66.     Indeed, nearly every analyst who asked a question during the earnings call asked specifically about Truly, what had happened, and what the Company now expected with Truly for upcoming quarters.

67.     On CNBC's Closing Bell the next day, the interviewer asked Defendant Burwick: "25% drop in the share price highlights the scale of difference in performance today relative to what the investment community's expectation was, and I guess the question there is at what stage

---

[18] *See* https://www.cnbc.com/2021/07/23/boston-beer-ceo-acknowledges-q2-hard-seltzer-sales-miss-we-dont-look-very-smart.html

during the past quarter, I mean, Jim Koch was on with us three months ago – he could not have been more positive about Truly and clearly something has happened different from how you guided, from the tones you put out before, including mid-quarter at various conferences – when did you realize that things had slipped behind expectation, and why wasn't there, sort of, more guidance along those lines to the investment community?"

68.     In response, Defendants' outlook remained positive. Despite the downturn in sales, Defendant Koch stated on the earnings call: "[w]e remain highly positive about the future growth of our brands and that our diversified brand portfolio continues to fuel double-digit growth." Burwick added, "[b]ased on the brand's innovation leadership, strong brand building and growing cultural relevance, we believe Truly is well positioned to continue to grow share." When asked about the possibility of inventory obsolescence costs, Defendant Smalla assured investors "we don't expect any write-off."

69.     Then, on September 8, 2021, after the market closed, Boston Beer withdrew its 2021 financial guidance, citing decelerating sales of hard seltzer products. The Company also stated that it "expects to incur hard seltzer-related inventory write-offs, shortfall fees payable to 3rd party brewers, and other costs" for the remainder of fiscal 2021.

70.     On this news, the Company's share price fell $21.09, or 3.7%, to close at $538.31 per share on September 9, 2021, on unusually heavy trading volume.

71.     Post Class-Period events continued to shed light on the impact of Truly on Boston Beer's true financial condition during the first two quarters of 2021. On Friday, October 22, 2021, Defendant Koch revealed in an interview on CNBC's "Closing Bell"[19] that Boston Beer had destroyed "millions of cases" of Truly, literally dumping millions of dollars in inventory down the

---

[19] https://www.cnbc.com/video/2021/10/22/boston-beer-ceo-hard-seltzer-wasnt-gonna-grow-forever-and-frankly-we-overbought.html

drain. "We were very aggressive about adding capacity, adding inventory, buying raw materials like cans and flavors, and frankly we overbought," he stated, "and when the growth stopped, we had more of all those things than we were going to be able to use, because there is a shelf life. We want Truly to have that fresh, bright taste, so we're gonna crush – uh – millions of cases of product – um – before it goes stale." The interviewer asked, "why didn't you just take promos, like we would normally see in food and beverage? Discount it?" To which Koch responded, "You know, that's just not what we do at Boston Beer. Our mission is to sell high quality products and to build high quality brands."

72.     On this news, the stock price dropped by $19.26, or approximately 4%, on unusually heavy trading volume. Over the next few days, as this news spread, the stock price continued to drop. By Wednesday, October 27, 2021 the stock price had fallen to $485.10 per share – the lowest it had been since May 2020 – a 61% drop from the first day of the Class Period.

<u>**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS**</u>

**A.  April 22, 2021**

73.     On April 22, 2021, Boston Beer published a press release on Form 8-K reporting the Company's financial results for the Q1:21. In the press release, Defendant Koch is quoted as saying:

> Early in 2021, we launched Truly Iced Tea Hard Seltzer and during the second quarter we plan to launch Truly Punch Hard Seltzer. Both combine refreshing hard seltzer with bold flavors and we believe these new launches continue to demonstrate our innovation leadership within the Hard Seltzer category. We are making steady progress in improving our brand support and messaging for our beer and cider brands to position them for long-term sustainable growth in the face of the difficult on-premise environment. ***We are optimistic that our on-premise business will significantly improve in 2021 as restrictions are slowly lifted***.

74.     This statement is materially false and misleading because, at the time, the shift of consumer demand away from off-premise consumption of alcoholic beverages and towards on-

premise consumption was already negatively affecting the hard seltzer category. Koch knew of this downturn – in fact, Defendant Smalla later stated that Boston Beer management was expecting a slowdown of demand for Truly in May and June, 2021. Defendant Burwick also admitted in a virtual panel with Brewbound in May 2021 that getting hard seltzer into the on-premise space was "not going to be easy" because most bars would only have room for "one or two brands," not the assortment consumers were used to seeing in retail stores. In that same panel, Ed McBrien, COO of a major beer distributor, explained that he was seeing bars open cautiously, and that places which had a dozen different beers on draft before the Covid-19 closures were cutting down to only four or five, making it very difficult for new products – and even old favorites – to make it. Thus, Koch's statement was directly contrary to management expectations at the time.

75.     Defendant Burwick is quoted as saying: "Overall, given the trends for the first three months and our current view of the remainder of the year, we've adjusted our expectations for higher 2021 full-year volume and earnings growth, which is primarily driven by the strong performance of our Truly and Twisted Tea brands."

76.     This statement was materially false and misleading for several reasons. At the time this statement was made, the hard seltzer market was already experiencing significant negative trends, including a shift to on-premise alcohol consumption and an increase in the number of competitors in the seltzer category. Burwick admitted to knowing about these trends at the time he made this statement. These downward trends indicated that it was unlikely there would be increased demand for Truly during the subsequent months. Defendant Smalla later stated that, contrary to the statement above, management knew there would be an impending slowdown of demand for Truly in May and June.

77.     Additionally, since distribution channels already had the maximum weeks-on-hand inventory of Truly, Defendants knew that sales in the second quarter would be unlikely to mirror, much less exceed, sales in Q1:21. As CW1 explained, Boston Beer was forcing its distributors to take product even though depletions had tapered off significantly, undercutting Burwick's statements about Truly's "strong performance." Defendants also knew, based on the Company's inventory monitoring, that sales had slowed and downstream inventory was high. Further, according to CW2, Boston Beer maintained a flawed and outdated forecasting system that could not meaningfully project the Company's performance for the remainder of the year, and instead, Boston Beer's forecasts were based on unsupported management representations. When taken collectively, these factors strongly indicate that demand for Truly would not grow at the rates projected by management, and the adjustment to Boston Beer's 2021 guidance was unfounded.

78.     Additionally, the timing of the guidance raise indicates it was misleading when made. On April 22, 2021, Defendants were nearly one-third of the way through the second quarter– a quarter in which Boston Beer drastically missed its sales targets. Industry experts agreed the decline in seltzer sales began sometime in March. By increasing their guidance at this time, Defendants knew the truth of their situation, and yet they raised their guidance nonetheless. The swift turnaround from guidance raise on April 22 to admitting results would be "softer than [] anticipated" on July 22 left analysts "truly struggling" to understand why Defendants had expressed such confidence.

79.     Burwick added: "We will continue to invest in capacity to take advantage of the fast-growing hard seltzer category and deliver against the increased demand through a combination of internal capacity increases and higher usage of third-party breweries."

80.     This statement was materially false and misleading because, at the time it was made, demand for hard seltzer was slowing, not "fast-growing." Defendants later admitted that they over-increased their production capacity for hard seltzer, eventually leading to "millions of cases" of Truly being destroyed.

81.     On the same day, April 22, 2021, Defendants conducted a quarterly earnings call in which Burwick, Smalla, and Koch participated. During the call, Defendant Burwick repeated his statement from the press release: "given the trends for the first 3 months and our current view of the remainder of the year, *we've adjusted our expectations for higher 2021 full year volume and earnings growth*, which is primarily driven by the strong performance of our Truly and Twisted Tea brands." (emphasis added).

82.     As described above, this statement was materially false and misleading because, at the time, Defendants knew about the negative trends in the hard seltzer market, including increased competition and declining sales due to a shift in on-premise alcohol consumption. Additionally, Defendants shipped more product in Q1:21 than distributors could sell, a "trend" which they knew could not continue in subsequent quarters.

83.     When asked about the deceleration in the hard seltzer industry, Burwick responded:

> *[W]e still think the category is going to grow significantly* . . . the consumer trends are still there, right? So you drive for health and wellness, for [IDCP], premiumization, they're still there, they're still evident. . . there's a lot of reasons why *we believe that category will actually now start to reaccelerate*, and *that's part of our calculation*. (emphasis added).

84.     This statement was materially false and misleading because, as the analyst who asked the question pointed out, at the time demand for hard seltzer had already begun slowing. Even if the category did gain shelf space, Defendants admittedly knew that there was an increasing number of new competitors in the seltzer market that would be occupying that shelf space.

Additionally, in a virtual panel with Brewbound in May 2021, when Defendant Burwick was asked if health and wellness was still a major consideration for Truly drinkers, and Burwick deemphasized it as a consideration, explaining that the seltzer demand had "become more nuanced and a little bit more complex." Defendant Smalla later admitted that the Company had expected a slowdown in May and June, spring and summer months that were supposed to be most conducive to seltzer sales. There was no indication, as Burwick suggested, that the category was going to "grow significantly" or "reaccelerate."

85.     When asked about Truly's market share compared to the "flood of competition" in the hard seltzer market, Burwick responded:

> *[W]e're going to plate the entire year to grow share*. So it's one thing to -- again, the category grows 60 to 90. Honestly, whatever it is, *we're going to grow faster*. That's what's happening and as the category grows 50 and we grow 70; [indiscernible] grows 90, we grow 110 going forward. But we believe, with the innovation we have lined up, and by the way, the brand investments, which is significant -- and a lot used to come -- still to come on the brand, *we feel like we've been lit and lined up to withstand the competition, as good as they are*. (emphasis added).

86.     This statement was materially false and misleading because it omitted several key facts, including the fact that at the time, the growth of the overall market for hard seltzer slowing, and would be unlikely to reach the 60-90% benchmark put forth by Defendants. According to CW2, Boston Beer did not have the capability to accurately forecast demand due to outdated systems and lack of personnel, and therefore based its forecasts on nothing but management say-so, a fact Defendants omitted when making this statement.

87.     Additionally, according to Evercore's market share data, Truly's market share was actually declining in the weeks leading up to this statement, so there was no support for the statement that Truly would grow faster than the rest of the market.[20]

---

[20] Eric Serotta and Robert Ottenstein, *Jim Koch at Beverage Forum*, EVERCORE ISI (May 12, 2021).

88.     In fact, according to Jefferies, Truly's market share growth overall was flat at this time, and that its' newest Lemonade and Iced Tea flavors had lost market share, in part due to the release of White Claw Iced Tea in March 2021. Additionally, new entrants Cacti and Topo Chico, both introduced in March 2021, were already carving out their own shares of the market. Jefferies, "expect[ed] competition to accelerate given significant brand support in '21 (industry hamstrung in '20), add'l capacity, and new product launches." Given the highly competitive nature of the hard seltzer market, a well-established fact at the time, Management could not expect that Truly's market share would grow at the rates promised. Defendants' foregoing April 22 statements contradicted this information, assuring the market that competition was not impacting Truly. However, in the Company's July 22, 2021 earnings call and press release, Defendants listed increased competition – which already existed as of April 22 – as one of the reasons they would not meet their 2021 guidance.

89.     Further, an analyst from Goldman Sachs asked, with regards to bars and restaurants reopening, "what [do] you see as the real opportunity for seltzers on-premise?" To which Burwick responded:

> We're seeing a lot of growth right now, definitely bar calls out there for the hard seltzer brands. And our on-premise team has been out actively selling and making a lot of progress on driving distribution within that channel. So we feel very optimistic that we're going to have a lot of Truly in the category in general.

90.     This statement was materially false and misleading because industry trends, both historically and at the time this statement was made, did not demonstrate "a lot of growth" in demand for hard seltzer at bars and restaurants and data continued to suggest that consumers preferred to drink hard seltzer at home. In fact, low demand for seltzer "on premise" and decreasing "off premise" sales were both listed as reasons sales of Truly were "softer than [] anticipated" in the Q2:21, indicating that, contrary to Burwick's statements to the market, the Company had not

made progress within in the on-premise channel. Defendant Burwick even admitted in May 2021 that getting hard seltzer into the on-premise space was "not going to be easy," directly contradicting his April 22 statement that the Company was "seeing a lot of growth right now" in on-premise Truly consumption.

91.     Defendants also released Boston Beer's financial report on Form 10-Q for Q1:21 on April 22, 2021. The 10-Q stated:

> Shipment volume for the quarter was significantly higher than depletions volume and resulted in significantly higher distributor inventory as of March 27, 2021 when compared to March 28, 2020. The Company believes distributor inventory as of March 27, 2021 averaged approximately 7 weeks on hand and was at an appropriate level, based on supply chain capacity constraints and inventory requirements to support the forecasted growth of Truly and Twisted Tea brands over the summer.

92.     This statement was materially false and misleading because, at the time, demand for hard seltzer was decreasing and, according to CW1, inventory was piling up downstream as a result of shipments outpacing demand; thus, seven weeks on hand was not an appropriate level of inventory. The fact shipment volume was "significantly higher" than depletions was not a positive for the company – rather, it was an indication that demand for hard seltzer was decreasing, and that, by continuing to ship more product than distributors could sell, Defendants were engaging in channel stuffing. Further, as mentioned above, Boston Beer's inventory trackers indicated that sales were slowing and inventory was increasing and, with the relatively short shelf life of freshness for Boston Beer's products, this indicated that distributor inventory was too high and getting higher.

93.     Based on Defendants' representations, particularly their guidance raise based on Truly sales, many analysts maintained or raised their price targets for the stock. For example, on April 22, 2021, Guggenheim raised their target price to $1,800 per share (previously $1,600), stating, "Management raised its top- and bottom line guidance for FY21 and said it plans to spend

more on advertising for Truly to support the brand's impressive trajectory. We reiterate our BUY

rating on SAM shares as our top growth pick." On April 23, Deutsche Bank raised their guidance

to $1,280 per share (previously $1,150), stating, "By all accounts, SAM delivered a knockout first

quarter to start the year, providing support for the shares, which have rallied more than +25% YTD

. . . The strong results were further underscored by an unanticipated (in our view) guidance raise

for shipments, depletions, and EPS." Morgan Stanley raised its target price from $1,400 to $1,530

per share, stating "raised FY21 depletions/EPS guidance highlights strong business momentum

with Truly market share gains in the hard seltzer category and more innovation coming in the key

summer months." Similarly, on April 23, an analyst from RBC Capital Management wrote, "SAM

management raised guidance for the year and now expects shipments and depletions in the range

of +40–50% (previously +35–45%) and EPS of $20.00–26.00 (previously $20.00–24.00) . . . We

also raise our price target, to $1,538 from $1,378, and reiterate our Outperform rating."

94.     The following day, April 23, 2021, the stock price opened at the highest it's ever

been – $1,338 per share, an approximately 5.5% increase over the opening price the day before.

## B.  Mid-Quarter Statements

95.     Over the next few months, Defendants continued to make materially false and

misleading statements about Truly's growth and market share in industry conferences and

interviews. These statements maintained the artificially inflated share price, which was over

$1,000 per share on most days.

96.     On May 12, 2021, Defendant Koch was interviewed at the 2021 Beverage Forum.

When asked about the slowdown of the hard seltzer industry, Koch replied, "Well we're expecting,

uh, something of a slowdown but, uh, not falling off a cliff. I think our best guesses now are

somewhere between 60-90% [growth]," a reiteration of the growth projections given during the

April 22, 2021 earnings call.  However, Koch noted, "I do see continued growth for hard seltzer, certainly well beyond 2021." Additionally, when asked about whether the on-premise channel would be important in the hard seltzer industry, Koch stated, "I do think it will be a significant source of growth for 2021 . . . I think this is the year for the acceptance of hard seltzers on-premise."

97.     These statements were materially false and misleading because trends in the hard seltzer industry, which Defendants claimed to be aware of, including a shift from off-premise to on-premise alcohol consumption and a slowing of household penetration, all indicated that demand for hard seltzer was plateauing, and would not continue to grow 60-90% in 2021 or "well beyond." In fact, low demand for seltzer "on premise" and decreasing "off premise" sales were both listed as reasons sales of Truly were "softer than [] anticipated" in the Q2:21. The on-premise channel was certainly not a "significant source of growth" for Truly in 2021.

98.     Additionally, Koch stated, "with Truly, we have been gaining share for, like, a year and a half. We expect it will continue to gain share in 2021."

99.     This statement was materially false and misleading because Truly had not consistently gained share over the prior year and a half, rather, it had hovered between 25 and 30%, and had been in decline for several weeks prior to this statement according to market share data. Moreover, for the first week of May 2021, Truly's market share was approximately 26%, a ***0% gain*** from Truly's market share as of December 28, 2019 – which was approximately 26%.[21]

100.    Further, Boston Beer was already seeing a slowing of demand for Truly, which was material information omitted from Koch's statements. Defendant Smalla stated that the Company was "expecting a slowdown in May and June," and CW1 stated that by May, demand for Truly

---

[21] *See* https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/big-brewers-pop-top-on-new-hard-seltzer-brands-in-2020-56743493

was already declining since wholesalers had taken on more inventory than they could sell in the first quarter.

101.    Based on Defendant Koch's statements at the Beverage Forum, analyst Eric Serotta of Evercore ISI rated Boston Beer "outperform," with a targeted price of $1,600 per share.

102.    On the same day as this interview, May 12, 2021, Defendant Koch sold $2,671,188 worth of stock. Over the next six weeks, he made similarly sized sales nearly every single day. Prior to this date, Defendant Koch rarely sold his Company stock.

103.    Defendant Burwick gave an interview in Beer Business Daily, an online trade journal focused on the beer industry, on June 24, 2021. In the interview – which was published less than a month before the July 22, 2021 conference call – Burwick stated: "We're still confident in Truly's ability to grow significantly despite the recent segment slowdown. Truly is the only established player that's growing in the high double digits, growing at double the segment, and YTD represents about 40% of all growth in the HSW category."

104.    This statement was materially false and misleading. Truly was not growing in the "high double digits" at the time. Burwick later conceded in the July 22, 2021 earnings call that "as we got into May and June," Truly "went from high double digit growth rate to low double digit growth rate." Importantly, Burwick's statements fail to disclose any slowdown in Truly sales, which, by Defendant Burwick's own later admission, had already started in May. To speak glowingly on the subject of Truly's growth, yet omit that Truly sales had already dramatically slowed, was materially misleading to the market.

105.    Evercore wrote a Flash Note that same day reflecting on Burwick's interview, noting that "Burwick remains highly confident in Truly's growth prospects, and also provided some additional color about recent performance, on-premise, and supply." Based on the comments,

Evercore "continue[d] to expect the hard seltzer category [to] accelerate," and maintained its "outperform" rating with a target price of $1,600 per share.

106.    Furthermore, both Bonnie Herzog of Goldman Sachs and MSNBC "Closing Bell" anchor Wilfred Frost characterized Koch and Burwick's mid-quarter statements as positive, and reiterative of the Company's bullish April 22, 2021 statements on Truly.

## DEFENDANTS CONTINUE TO MAKE MATERIALLY MISLEADING STATEMENTS AND OMISSIONS TO THE MARKET AS THE TRUTH IS REVEALED

107.    The artificial inflation caused by Defendants' misstatements and omissions was gradually removed from the stock through a series of revelations. However, even as Defendants corrected some of their previously misleading statements, they continued to mislead the market.

### A. July 22, 2021

108.    On July 22, 2021, at approximately 4:30pm EST, Boston Beer published a press release, filed with the SEC on Form 8-K and signed by Defendant Smalla, reporting the Company's Q2:21 results. The Company reported "Net income for the second quarter was $59.2 million, a decrease of $0.9 million or 1.6% from the same period" in the previous year.

109.    The press release announced that Boston Beer had changed several of its estimates for the year, for example, it now estimated shipment/depletion growth at between 25% and 40%, a decrease from the previously reported estimate of between 40% and 50%; and now estimated earnings per diluted share at between $18.00 and $22.00, a decrease from the previously reported estimate of between $22.00 and $26.00. Both of these metrics had been raised in April, just a few short months before. However, Boston Beer's full-year gross margin target remained the same, as it intended to spend less on advertising and marketing.

110.    Defendant Koch is quoted as saying:

During the second quarter we saw significant growth in the On-Premise channel
and re-opened all our retail locations as most COVID-19 restrictions have been
lifted. However, ***our 24% depletions growth for the second quarter decelerated
from our first quarter growth of 48% and was below our expectations, as the hard
seltzer category and overall beer industry were softer than we had anticipated.***
(emphasis added).

Koch continued to list the reasons for the decline in depletions of Truly:

(1) slowing growth in household penetration as the market matures and there is less
new trial, (2) a gradual transition of volume to the On-Premise channel as hard
seltzer becomes a more regular option in that channel, (3) new hard seltzer brands
at retail that resulted in a proliferation of choices and consumer confusion, and (4)
a challenging comparative period of significant pantry loading related to On-
Premise restrictions in the second quarter of 2020.

111.    In other words, sales declined for the exact reasons analysts had asked about in the

Q1:21 investor call, at which time Defendants assured investors that they had taken each of these

factors into consideration when increasing their guidance.

112.    Defendant Burwick is quoted as saying:

***We overestimated the growth of the hard seltzer category in the second quarter
and the demand for Truly***, which negatively impacted our volume and earnings for
the quarter and our estimates for the remainder of the year. We increased our
production of Truly to meet our summer peak and have had ***lower than anticipated
demand for certain Truly brand styles which has resulted in higher than planned
inventory levels*** at our breweries and increased supply chain costs and
complexity… ***Our outlook for the hard seltzer category in the second half of 2021
is uncertain*** and we have planned our capacity and spending based upon several
volume scenarios. (emphasis added).

113.    However, Burwick also stated:

While we are in a very competitive business, ***we are confident in the continued
growth of our current brand portfolio and innovations*** . . . We are excited about
our new Truly advertising campaign "No One Is Just One Flavor" featuring
Grammy award winner and pop icon Dua Lipa and showcasing Truly's superior
variety of flavors and the colorful and adventurous nature of Truly drinkers. ***Based
on the brand's innovation leadership, strong brand building and growing
cultural relevance, we believe Truly is well positioned to continue to grow share***.
(emphasis added).

114.    Thus, while Defendants admitted that demand for Truly was declining so swiftly that they could not accurately estimate shipment volumes for the remainder of the year, they continued to misrepresent that they anticipated growth, and even set new guidance that was only slightly short of the targets set on April 22.

115.    On the same day, July 22, 2021, at 5:00pm EST, Boston Beer conducted a quarterly earnings call in which Defendants Burwick, Smalla, and Koch each participated. In their prepared statements, Defendants Burwick and Koch made substantially similar statements to those in the press release, discussed in the paragraphs above.

116.    In the question-and-answer portion of the call, analyst Bonnie Herzog of Goldman Sachs asked:

> I don't maybe even know where to begin. I understand that the category has been flowing, everyone is aware of this. That said, I'm truly struggling and yes, pun intended, with how meaningfully your results have deteriorated? I guess I'm saying this because *even as recently as May, your tone and comments suggested that even with a slowdown in the category you could still deliver relatively strong growth and hit your full year guidance.* So I guess for me this begs the question. How confident are you that you're going to be able to hit your new guidance, and really how much visibility do you have in your business? (emphasis added).

117.    Defendant Burwick responded that, in May and June, "we kind of hit that inflection point in the S curve where things went from high double digit growth rate to low double digit growth rate. And that was the first signal really as we got into May and June, and we had expected to hit that second bump better." However, Koch and Burwick continued to misrepresent in May, and even as late as June 24, that Boston Beer expected strong growth.

118.    Burwick continued, "Yes, we hit the S curve, you know that -- we can see that. Unfortunately, that's looking backwards, it's just kind of hard to see it coming looking forwards." However, Defendant Smalla later admitted that management expected there would be a slowdown

in May and June. Further, starting in March 2021, numerous trends, including the transition from off-premise to on-premise alcohol consumption, pointed to the decline of the hard seltzer industry. In other words, the decline in demand for hard seltzer was not some kind of surprise that no one saw coming. Defendants knew it would happen and misled the market to buy time so they could unload over $100 million in stock.

119.    Burwick went on to list the reasons for the decline, including "the proliferation of brands in th[e] category" and "this move from off premise to on premise." However, analysts during the April 22 earnings call specifically asked Burwick about both the increase in competition and the move from off-premise to on-premise, and at that time Burwick assured investors that management had considered each of these factors when raising the Company's guidance. In truth, Defendants had considered these factors and predicted a decline in the stock yet continued to mislead the public about Truly's projected growth.

120.    In response to Harzog's question as to why management was "confident" that they would "hit [their] new guidance," Burwick stated that third party experts expected the category to grow at 20-50%, and "we know we can grow faster than the category." However, Burwick did not say why he was confident Truly would outgrow the category. For the months preceding this call, Truly had steadily occupied between 25 and 30% of the market share, and the 30% weeks were shortly after the introduction of new products. At the time of this call, Truly did not have any more product launches on the horizon, and Defendant Koch stated that they were "close to a full suite" of Truly products. The category remained very competitive, with new brands and new products frequently launching. Nevertheless, Burwick stated: "[w]e've been doing it for a long time now and we feel very confident." In other words, because Truly had outgrown the category in the past,

ignoring data and industry trends about the future, Boston Beer management simply made the assumption that it would outgrow the category again.

121.    When asked if Boston Beer expected any inventory obsolescence costs, Defendant Smalla replied, "from a weeks of supply forward-looking perspective, at this point, we don't expect any write-off, so everything is reflected. So there shouldn't be -- unless there's another significant slowdown, which we don't expect." However, just *six weeks later*, on September 8, 2021, Boston Beer announced it was expecting to incur "seltzer-related inventory write-offs." A few months later, on October 22, 2021, Defendant Koch stated in an interview on CNBC's "Closing Bell" that Boston Beer had destroyed "millions of cases" of Truly because the Company overbought materials, and then the growth stopped. As explained above and by Smalla's and Burwick's own admissions, by the July 22, 2021 earnings call, Defendants already knew about the dramatic slowdown of demand for Truly, and thus, that a write-off was likely imminent. Moreover, CW1 explained that there was "too much" Truly at this point in time and it was not selling fast enough to deplete before its expiration, including Truly's relatively new iced-tea flavor.

122.    When an analyst from Morgan Stanley asked for "a little bit more color" on management's expectations for Truly in the second half of the year, and how it would compare to the second half of 2020, Defendant Smalla stated that it was "really hard" to answer that question, because "it's really hard to predict," for example, Smalla stated that "***we were expecting a slowdown in May and June***" but "the slowdown was a little bit stronger than what we had expected." (emphasis added). However, Smalla stated, the current guidance was management's "best estimate based on what we have seen and what we believe." That is to say, even though Defendants had raised their 2021 guidance despite anticipating a slowdown in May and June, they expected their current estimates to be correct based on vague and subjective beliefs.

123.    Analysts had mixed reactions to management's representations during the July 22 earnings call. For example, while Guggenheim reduced its target price from $1,800 per share to $1,500 per share following the "surprisingly disappointing 2Q results," it retained a "Buy" rating for Boston Beer, noting "Management continues to expect gross margin in the range of 45-47%." UBS also maintained a "Buy" rating while reducing its target price, viewing management's revised outlook as "achievable." On the other hand, Jefferies rated Boston Beer as "underperform" and dropped their target price from $760 to $685 per share, stating: "SAM's 2Q fell well short of expectations and the co. cut its outlook sharply, owing to the much-discussed slowdown in the hard seltzer industry."

124.    The market as whole, however, reacted severely to the revelations, and the stock price dropped from $947 per share at closing on July 22, 2021 to $701 per share at closing on July 23, 2021 – an astonishing 26% decline.

**B.  July 23, 2021**

125.    The following day, July 23, 2021, Defendant Burwick appeared on CNBC's Opening Bell. The interviewer echoed the confused sentiment several analysts expressed during the previous day's earnings call, asking:

> 25% drop in the share price highlights the scale of difference in performance today relative to what the investment community's expectation was, and I guess the question there is at what stage during the past quarter  - I mean, **_Jim Koch was on with us three months ago, he could not have been more positive about Truly_**, and clearly something has happened different from how you guided, from the tones you put out before, **_including mid-quarter at various conferences_** – when did you realize that things had slipped behind expectation, and why wasn't there sort of more guidance along those lines to the investment community? (emphasis added).

Burwick responded that this was a "fair question," and that the company started to notice the shift around Memorial Day. He elaborated that during that time:

What really started to happen around Memorial Day was we hit the holidays during the summer, we didn't see it come back the way we had expected, and I think one of the things that's going on here that is different than the March/April time period is that, you know, ***the country was opening up, and people were going on to bars and restaurants, and that's where hard seltzer isn't as well developed in those channels yet***. It will be, it's getting there, but it's not. So the kind of trade-off of grocery store and liquor store purchases, consuming at home, to bars during that time period particularly as the summer hit is really what hit us, and honestly it like – it hit hard and fast, and - find somebody out here who knew it was going to hit that fast, and that's – at the time it doesn't look good, we don't look very smart by missing on that guidance. (emphasis added).

However, far from Burwick's representations, industry experts, analysts, other companies, pretty much everyone other than Boston Beer had predicted that the demand for hard seltzer would decline once bars and restaurants began opening. Even Defendant Smalla stated that the Company had anticipated a slow down in May and June. The reason Defendants continued to reinforce their April guidance mid-quarter was not because they weren't "very smart" but because they were attempting to maintain the inflated stock price for as long as possible in order to reap millions of dollars in personal proceeds from stock sales.

126.    Additionally, even taking Burwick's statement at face value, he admits that the Company was seeing signs of the slowdown by Memorial Day – May 31, 2021. However, on June 24, over three weeks later, Burwick represented in an interview that Truly was "growing in the high double digits" and that management was "confident in Truly's ability to grow significantly despite the recent segment slowdown."

127.    On June 9, 2021 – after Memorial Day – after management knew with certainty Boston Beer would not meet its guidance for the second quarter – Defendant Burwick sold approximately $1.5 million worth of stock. Between Memorial Day and July 8, 2021, Defendant Koch sold approximately $69 million worth of stock. He did not sell any stock for the remainder of 2021.

**C.  September 8, 2021**

128.    On September 8, 2021, mid-quarter, after market close, Boston Beer issued a press release withdrawing the financial guidance it issued on July 22, 2021 and announcing that the Company expected that full year 2021 earnings per diluted share would "fall below the previously reported estimate of between $18.00 and $22.00." The press release was filed with the SEC on Form 8-K and was signed by Defendant Burwick.

129.    "[T]he market for hard seltzer products has continued to experience decelerating growth trends," the Company stated in the press release, "we believe there will be continuing uncertainty about hard seltzer demand trends for the remainder of 2021. As a result of this uncertainty and its impact on our volume trends, the Company is withdrawing its 2021 financial guidance issued on July 22, 2021."

130.    "Further," the statement continued, "the Company now expects to incur hard seltzer-related inventory write-offs, shortfall fees payable to 3rd party brewers, and other costs that will be expensed during the remainder of fiscal 2021." This statement was made barely 6 weeks after Defendant Smalla had assured the public that he was confident Boston Beer would not need to take any write-offs.

131.    Calling the withdrawal a "more aggressive cut than most expected," an analyst report from UBS criticized management, stating: "Net, we believe the buy-side expected a more cautious tone from mgt given the steady category slowdown since July in addition to ***leadership's acknowledgement that it failed to properly manage expectations ahead of 2Q21***." (emphasis added). Analysts from Guggenheim drastically reduced its target price, from $1,200 per share to $775 per share, noting: "This announcement follows management reducing the guidance metrics – both top- and bottom-line – ***just seven weeks ago*** in July when it reported 2Q earnings results."

(emphasis added). They speculated that the mid-quarter announcement was an attempt by management "to be more transparent about what it is seeing after getting significant pushback from investors last quarter." Other analysts likewise significantly lowered their price targets, such as RBC Capital Markets (lowered to $627 per share from $1,134), Credit Suisse (lowered to $965 per share from $1,281), and Evercore ISI (lowered to $700 per share from $950).

132.    On this news, the stock price fell 10% overnight, from $559.40 per share at closing on September 8, 2021 to $515.00 at opening on September 9, 2021. The stock eventually closed at $538.31 per share on September 9, a 3.7% decline from the previous day, on unusually heavy trading volume.

## POST CLASS PERIOD EVENTS

133.    Events which occurred post Class Period offer further proof that Defendants statements were materially false and misleading when made.

134.    On October 21, 2021, after market close, Boston Beer released its third quarter financial reporting. In a press release, filed with the SEC on Form 8-K, the Company reported a net loss, which it stated was a "primarily a result of direct and indirect volume adjustment costs of $133.0 million, or $7.73 per diluted share, net of tax benefits, due to slower than anticipated hard seltzer growth." A quote from Burwick explained, "The unexpected rapid slowdown of hard seltzer category growth this summer significantly impacted our business… the capacity and inventory we had built to take advantage of a higher-growth environment resulted in significant temporary costs this quarter."

135.    Similarly, in an earnings call on the same day, in which each of the Individual Defendants participated, Koch stated, "we experienced very large unanticipated costs as the result of the sudden, unexpected slowing of growth in hard seltzer."

136.    Defendants' attempts, in hindsight, to claim that the deceleration of the hard seltzer industry was "unexpected" and "sudden" are directly contradicted by the fact that industry experts, analysts, and even Defendants themselves anticipated, from as early as March 2021 but with certainty by Memorial Day 2021, that trends such as the shift from off-premise to on-premise alcohol consumption and slowing growth in household penetration were leading to a slowing of demand for hard seltzer.

137.    In the earnings call, Burwick also revealed that Truly had "significantly higher-than-planned distributor inventory levels for certain styles and packages," suggesting that inventory levels had still not normalized from the channel stuffing Defendants engaged in in the first quarter of the year. These first quarter shipments were used to inflate Truly's sales numbers, lending credibility to Defendants' guidance raise, even though industry experts were already predicting a deceleration of growth throughout the hard seltzer category.

138.    In this call, Defendant Burwick also stated that "June and July 2021" was "when the category started to decelerate rapidly." Even though this statement is contrary to Burwick's previous statements that the decline was evident by Memorial Day 2021, and Smalla's statements that management anticipated a slowdown in May and June 2021, taking it at face value, this means Burwick already knew of the decline when he made statements about Truly's "high double digit" growth on June 24, 2021 and when defendants made their revised projections and optimistic statements on July 22, 2021, at which time Defendant Smalla had assured the public that the Company was not expecting a write off.

139.    The next day, on October 22, 2021, Defendant Koch explained in an interview on CNBC's "Closing Bell" that Boston Beer had destroyed "millions of cases" of Truly, literally dumping millions of dollars in inventory down the drain. "We were very aggressive about adding

capacity, adding inventory, buying raw materials like cans and flavors, and frankly we overbought," he stated, "and when the growth stopped, we had more of all those things than we were going to be able to use, because there is a shelf life. We want Truly to have that fresh, bright taste, so we're gonna crush – uh – millions of cases of product – um – before it goes stale."

140.     Once again, Defendants played off the $133 million write-off as if it was a simple mistake, an event no one could have seen coming – except possibly the analyst that directly questioned Defendants about a possible write-off a mere six weeks before they announced they would be taking one. In truth, Defendants were merely delaying the inevitable, at the expense of Lead Plaintiff and the other members of the Class.

## LOSS CAUSATION/ECONOMIC LOSS

141.     As alleged herein, during the class period, Defendants made a number of material misstatements and omissions regarding actual and projected sales of Truly Hard Seltzer and the hard seltzer industry generally. Notably, despite industry data indicating a decline in the hard seltzer industry – trends which Defendants admitted to being aware of and were specifically questioned about – Defendants continued to insist that Truly was an outlier, and its sales would continue to grow. Defendants even raised the Company's 2021 guidance, noting as support the high number of shipments in the first quarter, despite the fact that depletions (*i.e.* sales) were far lower. These statements drove the stock price to an astronomical high of $1,338 per share on April 23, 2021 and maintained the stock price above $1,000 for the majority of days over the next several months. While the stock price was inflated, Defendants made massive stock sales, totaling over $100 million in proceeds.

142.     The truth first began to emerge on July 22, 2021, after market close, when Defendants lowered their guidance for the year, much to the surprise of analysts and investors,

citing "softer that [] anticipated" sales of Truly. On this news, the share price dropped 26%, falling to $701 per share on July 23, 2021. As discussed above, market analysts, as well as Defendants themselves, attributed this steep decline to the revelations about Truly performance. However, Defendants continued to mislead the market with optimistic statements about Truly's growth.

143.    Then, on September 8, 2021 – just six weeks later – the Company withdrew its 2021 guidance entirely due to the continuing decline for demand of Truly Hard Seltzer. On this news, the share price fell an additional 3.7%, closing at $538.31 per share on September 9, 2021, a decline of approximately _60%_ from the first day of the class period.

144.    The economic loss suffered by Plaintiff and the other members of the Class was a direct result of Defendants' fraudulent statements and omissions. The economic loss, *i.e.*, damages suffered by Plaintiff and other members of the Class, was a direct result of Defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of Defendants' prior misstatements and omissions being revealed.

## **SCIENTER**

145.    Suspiciously timed stock sales of nearly ***$115 million***, as well as the Individual Defendants' own admissions of material non-public information that contradicted their public statements, support the inference that Defendants acted with scienter in that Defendants knew and/or recklessly disregarded facts available to them that demonstrated that the public documents and statements issued or disseminated by them individually or in the name of the Company were materially false and misleading.

A. **Insider Trading by Individual Defendants Supports a Strong Inference of Scienter**

146.    During the Class Period, Defendants Koch and Burwick sold massive amounts of their personal holdings of Boston Beer stock while in possession of material, non-public information, which supports a strong inference of scienter. Not only were their stock sales suspiciously large in quantity (and especially so with respect to Defendant Koch), but they were also suspiciously timed and inconsistent with their pre- and post-Class Period trading practices. Although Defendants Koch and Burwick each entered into (and sold stock pursuant to) 10b5-1 trading plans, they did so at highly suspicious times, with Defendant Koch entering into trading plans on March 5, 2021 (just fifteen business days before the end of the Q1:21 reporting period ended March 27, 2021) *and* May 7, 2021 (just eleven business days after Defendants filed the Q1:21 Form 10-Q that initiated the Class Period on April 22, 2021) and Defendant Burwick entering into a trading plan on May 9, 2021 (also just eleven business days after Defendants filed the Q1:21 Form 10-Q that initiated the Class Period on April 22, 2021).

147.    Collectively, Koch and Burwick sold nearly 109,000 shares of Boston Beer stock over the course of the Class Period for proceeds of nearly $115 million. Yet, since the Class Period ended on September 8, 2021 and the artificial inflation was removed from Boston Beer's common stock, neither Burwick nor Koch has sold a single share. Similarly, throughout the entire fiscal quarter preceding the start of the Class Period, Defendant Burwick sold just 264 shares for proceeds of $262,492.56 and Defendant Koch sold just 46 shares for proceeds of $45,737.34.

148.    To evaluate the Individual Defendants' selling activity, Plaintiff used the publicly available trading data that is required to be reported to the SEC on Form 4s in conjunction with data from Refinitiv Eikon (formerly Thomson Eikon). Plaintiff analyzed the trading by the Individual Defendants that occurred during the Class Period (140 days) and during the period

immediately preceding the Class Period (116 days) (beginning on December 27, 2020, the first day of Q1:21, and ending on April 21, 2021), together with the period immediately following the Class Period (127 days) (beginning on September 9, 2021 through the date of filing) (the "Control Period"). The Boston Beer Form 4s relating to sales of stock by Defendants Burwick and Koch during the Class Period and the Control Period are incorporated herein by reference.

149.    Plaintiff calculated the total sales by Defendants Koch and Burwick, together with the cash proceeds from such sales, during the Class Period and the Control Period. Those figures were then compared to identify whether the Individual Defendants' sales during the Class Period were consistent with their sales during the Control Period. During the Class Period, Defendant Koch sold 100,000 shares for $103,459,043.08, but during the Control Period he only sold 46 shares for $45,737.34. Thus, Koch sold 99,954 more shares and made $103,413,305.74 more in gross proceeds during the Class Period than during the Control Period. Similarly, during the Class Period, Defendant Burwick sold 8,805 shares for $10,518,883.44, but during the Control Period he only sold 264 shares for $262,492.56. Thus, Burwick sold 8,541 more shares and made $10,256,390.88 more in gross proceeds during the Class Period than during the Control Period.

150.    Put another way, Defendant Koch sold nearly *2,174* times as many shares during the Class Period than during the Control Period for over *2,262* times the proceeds. Defendant Burwick sold over *33* times as many shares during the Class Period than during the Control Period for over *40* times the proceeds. Indeed, both Koch and Burwick each only effectuated a single sale during the entire Control Period.

151.    These analyses reveal not only that Defendants Koch and Burwick's Class Period sales of Boston Beer common stock were large in absolute terms, but also that they were inconsistent with their selling activity outside the Class Period.

152.    Defendant Koch's liquidation of **100,000** shares for proceeds of **$103,459,043.08** represented between *167.01%* (calculated as of the beginning of the Class Period, when Koch's holdings totaled 59,875 shares) and *167.06%* (calculated as of the end of the Class Period, when Koch's holdings totaled 59,858 shares) of his total shares of Boston Beer common stock. Koch's sales in excess of his initial and ending Class Period holdings were only made possible due to his suspiciously timed May 14, 2021 conversion of 99,983 shares of Boston Beer Class B common stock to Class A common stock, thereby increasing his holdings as of that date to 154,858 shares. Calculated as of May 14, 2021, Koch's liquidation of 100,000 shares represented *64.58%* of the greatest number of shares he held at any one time throughout the Class Period (154,858 shares).

153.    Defendant Burwick's liquidation of **8,805** shares for proceeds of **$10,518,883.44** represented between *17.49%* (calculated as of the beginning of the Class Period, when Burwick's holdings totaled 50,341 shares) and *21.09%* (calculated as of the end of the Class Period, when Burwick's holdings totaled 41,743 shares) of his total shares of Boston Beer common stock.

154.    In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5-1, which provides that a person will be deemed to have traded "on the basis of" material, nonpublic information if they person engaging in the transaction was "aware of" that information at the time of the trade.

155.    The SEC also created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 plans"). *See id.* at 51, 727-28. Pursuant to SEC Rule 10b5-1(c), a 10b5-1 plan is a potential defense to accusations of insider trading only if it is entered into by an insider "before becoming aware" of inside information and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

156.    Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to

a person's good faith." Thomson West, Corporate Counsel's Guide to Insider Trading and Reporting § 12:26 (2006). Conversely, the adoption and/or modification of these plans while in possession of material, non-public information is highly suspicious and supportive of scienter.

157.    First, ***89.69%*** of Defendant Burwick's Class Period sales were *not* made pursuant to a 10b5-1 trading plan. Defendant Burwick's Form 4 filed on April 30, 2021 indicates he sold 7,898 shares (for total proceeds of $9,558,080.62) on the same date – six business days *after* the beginning of the Class Period – and does not state that those sales were made pursuant to a 10b5-1 trading plan.

158.    Thereafter, on May 12, 2021, Defendants filed a Form 8-K with the SEC stating that, "[d]uring the period from April 27 to May 10, 2021," both Defendants Koch and Burwick (along with Boston Beer SVP of Supply Chain Quincy Troupe and the David A. Burwick 2020 Irrevocable Trust (the trustee and beneficiary of which is/was Mr. Burwick's spouse)) "entered into individual sales plans pursuant to Rule 10b5-1…." The Form 8-K further stated that "[t]he aggregate number of shares that may be sold pursuant to these 10b5-1 plans is 69,101 shares" and that "[t]he purpose of each of these 10b5-1 plans is to provide liquidity and investment diversification."

159.    That same day, Defendant Koch initiated a prolific pattern of selling that continued virtually unabated until July 8, 2021. From May 12, 2021 through June 9, 2021 Defendant Koch sold some 50,000 shares for total proceeds of $53,516,691.14. According to the corresponding Form 4s filed by Defendant Koch for those sales, however, each such sale was "effected pursuant to a Rule 10b5-1 trading plan adopted…on March 5, 2021."

160.    Previously, on March 9, 2021, Defendants filed a Form 8-K with the SEC stating that, "[d]uring the period from February 22 to March 5, 2021," Defendant Koch (along with

Quincy Troupe, Chief People Officer Carolyn O'Boyle, and the Valette Family Revocable Trust (the trustee and beneficiary of which is/was Boston Beer Director Jean-Michael Valette)) "entered into individual sales plans pursuant to Rule 10b5-1…." The Form 8-K further stated that "[t]he aggregate number of shares that may be sold pursuant to these 10b5-1 plans is 211,250 shares" and that "[t]he purpose of each of these 10b5-1 plans is to provide liquidity and investment diversification."

161.    Interestingly, however, from March 5, 2021 until May 12, 2021, Defendant Koch did not sell any shares of Boston Beer common stock – either pursuant to that 10b5-1 plan adopted on March 5, 2021 or otherwise. And, while all of Defendant Koch's Class Period sales from May 12, 2021 through June 9, 2021, were attributed to his March 5, 2021 10b5-1 trading plan, his subsequent Class Period sales of 50,000 shares effectuated between June 10, 2021 and July 8, 2021 (for total proceeds of $49,942,351.94), "were effected pursuant to a Rule 10b5-1 trading plan adopted…on May 7, 2021."

162.    With respect to Defendant Burwick, subsequent to his sales of 7,898 shares on April 30, 2021, he sold another 907 shares on June 9, 2021, for total proceeds of $960,802.82. According to the corresponding Form 4 filed on June 10, 2021, these sales "were effected pursuant to a Rule 10b5-1 trading plan adopted…on May 9, 2021."

163.    Thus, while both Defendants Koch and Burwick effectuated sales pursuant to 10b5-1 trading plans during the Class Period, in each case the circumstances of those sales are sufficiently suspicious to overwhelm any inference that they were made in good faith.

**Defendant Koch**

164.    As described above, Defendant Koch's first sale of Boston Beer common stock during the Class Period was effectuated on May 12, 2021. Koch then sold 2,500 shares on each

trading day during the Class Period up through July 8, 2021, for total Class Period sales of 100,000 shares. Koch abruptly stopped trading under his 10b5-1 plans just ten business days before Boston Beer released its financial results for Q2:21 on July 22, 2021, at which time the Company's share price fell $246.54, or 26%, to close at $701.00 per share on July 23, 2021, on unusually heavy trading volume. What's more, during the entire control period, Defendant Koch effectuated only a solitary sale: a January 4, 2021 order for 46 shares.

165.     Defendant Koch's adoption of two different 10b5-1 trading plans, one on March 5, 2021 (when he was likely to have known Boston Beer would raise its guidance for in its Q1:21 financial results) and another on May 7, 2021 (*during* the Class Period and just eleven business days after Boston Beer raised its guidance on April 22, 2021), pursuant to which he sold 100,000 shares during the Class Period, further supports a strong inference of scienter. By adopting those trading plans Defendant Koch took advantage of the inflated stock price. Indeed, Defendant Koch adopted the second 10b5-1 trading plan on May 7, 2021 so that he could sell an *additional* 50,000 shares while the price of Boston Beer's common stock remained artificially inflated – as he was apparently only able to sell 50,000 shares pursuant to the March 5, 2021, trading plan. This is evinced by the fact that, on May 14, 2021, Koch converted 99,983 shares of Boston Beer Class B common stock to Class A common stock for the sole purpose of liquidation under the 10b5-1 trading plan he adopted just five business days earlier.

166.     Koch has not sold a single share of stock since the end of the Class Period.

**Defendant Burwick**

167.     As described above, ***89.69%*** of Defendant Burwick's Class Period sales were *not* made pursuant to a 10b5-1 trading plan. Defendant Burwick sold 7,898 shares (for total proceeds of $9,558,080.62) on April 30, 2021 – six business days *after* the beginning of the Class Period –

and the corresponding Form 4, unlike the Form 4 filed in connection with his June 9, 2021 sales, does not indicate the sales were made pursuant to a 10b5-1 trading plan. As such, Burwick is not entitled to an affirmative defense based on a 10b5-1 trading plan for these shares. Defendant Burwick's adoption of a 10b5-1 trading plan on May 9, 2021, during the Class Period, likewise renders his June 9, 2021 sales of 907 pursuant to that trading plan highly suspicious. What's more, during the entire Control Period, Defendant Burwick effectuated only a solitary sale: a January 4, 2021 order for 264 shares.

168.    Burwick has not sold a single share of stock since the end of the Class Period.

**B.   Defendants' Admissions as to When They Knew Adverse Information About Truly That Contradicted Their Public Statements Supports a Strong Inference of Scienter**

169.    Industry data indicated that, generally, the rapid growth of the hard seltzer industry began decelerating around March 2021. Trends such as plateauing household penetration, increased competition in the space, and the re-opening of bars and restaurants, leading to a shift from off-premise to on-premise alcohol consumption, were well-documented before Defendants released their April 22, 2021 financial reporting, in which they raised their 2021 guidance on the premise of anticipated continued growth in sales of Truly Hard Seltzer. In the April 22 earnings call, analysts even pointedly asked Defendants about these factors, and if Defendants had taken them into consideration, to which Defendants replied that they had. However, on July 22, 2021 – just three months later – Defendants re-lowered their guidance, citing the exact factors analysts had asked about in the April 22 call. These facts indicate that Defendants either knew or recklessly disregarded the truth that their overwhelmingly positive April 22, 2021 statements about Truly were materially false and misleading when made.

170.    Defendant Smalla stated in the July 22, 2021 earnings call "***we were expecting a slowdown in May and June***." This indicates that Defendants knew, at the time of the April 22 call,

that sales would be slowing down – yet failed to disclose that information to the market, and instead told investors and the public that they were so confident in Truly's continued growth that they were raising their 2021 guidance.

171.    Despite expecting a slowdown, Defendants went on to make mid-quarter statements regarding Truly's continued growth in May and June, 2021. On May 12, 2021, Defendant Koch presented a keynote address at the 2021 Beverage Forum. In his presentation, he stated that truly had been gaining market share for a year and a half, that he expected Truly to gain market share in 2021, that he forecasted the hard seltzer industry would grow 60-90% in 2021, and that 2021 would be the breakout year for hard seltzer in the on-premise channel. However, according to CW1, demand for Truly had already slowed in May 2021 because wholesalers had taken too much inventory during the first quarter and was unable to sell through all of it.

172.    Then, on June 24, 2021, Defendant Burwick gave an interview with Beer Business Daily, during which he stated that Truly was still experiencing growth in the "high double-digits" and that management was "still confident in Truly's ability to grow significantly despite the recent segment slowdown."

173.    Burwick himself admitted in the July 22, 2021 earnings call that "as we got into May and June," Truly "went from high double digit growth rate to *low double digit growth* rate." This means that, at most, by the end of June, he had actual knowledge that Truly was not growing in the "high double digits."

174.    Later, in a July 23, 2021 interview with CNBC's Closing Bell, Burwick changed this timeline, stating that Defendants became aware of the slow-down around Memorial Day (May 31). However, even if this timeline is accurate, it means that Burwick certainly knew of slowing sales by June 24, 2021.

175.    Analysts were also confused by the timing of Defendants' statements. For example, in the July 22, 2021 earnings call, Bonnie Herzog of Goldman Sachs stated: "I don't maybe even know where to begin . . . ***even as recently as May***, your tone and comments suggested that even with a slowdown in the category you could still deliver relatively strong growth and hit your full year guidance."

176.    Similarly, the next day, an interviewer on CNBC's Closing Bell asked Burwick, "at what stage during the past quarter – I mean, ***Jim Koch was on with us three months ago*** – he could not have been more positive about Truly and clearly something has happened different from how you guided, from the tones you put out before, ***including mid-quarter at various conferences***– when did you realize that things had slipped behind expectation, and why wasn't there, sort of, more guidance along those lines to the investment community?"

177.    These queries suggest that analysts were incredulous of Defendants' assertions that Defendants did not know the truth of the situation when they made their false and misleading mid-quarter statements.

178.    Then, in the July 22, 2021 earnings call and press release, Defendants set new, slightly lowered guidance and assured the public that, while they missed the numbers set in April, they were confident they could hit the revised targets. Defendant Smalla also stated, in response to a question about inventory obsolescence, "we don't expect any write-off." However, CW1 explained that by mid-summer 2021, distributors already had "too much inventory" to get through, and that Truly was "not moving fast enough" to consume it all before expiration.

179.    On September 8, 2021 – ***only about six weeks later*** – Defendants withdrew their 2021 guidance altogether and announced they would be taking an inventory write-off of approximately $133 million.

180.    Later, Defendant Koch explained that the write-off was due to the fact that, back in April 2021, management "overbought" materials like flavors and cans, and that the Company planned to "crush…millions of cases of Truly" before it expired.

### C.  Additional Indicia of Scienter

181.    Defendants Koch (the Company's Founder and Chairman), Burwick (the Company's CEO), and Smalla (the Company's CFO) were well-aware of and informed of matters relating to the Company's core operations, as well as its established business policies and practices. Consequently, their experience and responsibilities necessarily further support a strong inference that they knew (or at least recklessly disregarded) that the statements at issue herein and made during the Class Period were material false and misleading and contained material omissions.

182.    Given that Boston Beer's massive revenue growth from 2019-2021 was largely attributable to sales of Truly hard seltzer, Truly sales were of critical importance to Defendants. As such, Defendants knew or should have known that Truly sales were decelerating and that, as a result, Boston Beer was reasonably likely to incur inventory write-offs.

183.    Moreover, because of the Individual Defendants' positions within the Company, they each had access to the adverse undisclosed information about Boston Beer's business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them connection therewith.

184.    Furthermore, because Defendants Koch, Burwick, and Smalla were respectively the Founder, the highest-level officer, and the highest-level financial officer of Boston Beer during the Class Period, they were each in a position to know facts of critical importance about the Company's business.

185.    By virtue of their high-level positions and the integral role Truly played in the Company's success, Defendants Koch, Burwick, and Smalla knew or should have known the adverse facts Truly sales that contradicted their public statements. As officers and controlling persons of a publicly-held company whose securities are registered with the SEC pursuant, publicly traded, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

186.    Defendants acted with scienter in that each Defendant knew and/or recklessly disregarded facts available to them that demonstrated that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and, knowingly or recklessly disregarded, and/or substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants participated in the fraudulent scheme alleged by virtue

of their receipt of information reflecting the true facts regarding Boston Beer, their control over the Company's alleged materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential information concerning Boston Beer and Truly Hard Seltzer.

## PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY

187.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly materially false and misleading statements pleaded in this complaint. First, many of the statements were in reference to present or past events – not forward-looking. Second, many of the specific statements pleaded herein were not identified as "forward-looking statements" when made, such as those during interviews and conferences. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

188.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Boston Beer who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

189.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased publicly traded Boston Beer securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Boston

Beer and its subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

190.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Boston Beer securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

191.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

192.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

193.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the Exchange Act was violated by Defendants' acts as alleged herein;

(b)  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of the Company;

(c) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of the Company;

(d) whether the Defendants caused the Company to issue materially false and misleading filings during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing materially false and misleading filings;

(f) whether the prices of Boston Beer securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

194.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

195.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Boston Beer shares met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

(b) As a public issuer, the Company filed periodic public reports;

(c) Boston Beer regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) Boston Beer securities were liquid and traded with moderate to heavy volume during the Class Period; and

(e) The Company was followed by a several securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

196.    Based on the foregoing, the market for Boston Beer securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

197.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## CLAIMS FOR RELIEF

### COUNT I

**(For Violations of §10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder - Against All Defendants)**

198.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

199.    During the Class Period, Defendants, individually and in concert, directly or indirectly, (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Boston Beer securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

200.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Boston Beer's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential information concerning the Company, participated in the fraudulent scheme alleged herein.

201.    Individual Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Boston Beer personnel to members of the investing public, including Plaintiff and the Class.

202.    As a result of the foregoing, the market price of Boston Beer securities was artificially inflated during the Class Period. Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Boston Beer securities during the Class Period in purchasing Boston Beer securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

203.    Had Plaintiff and the other members of the Class been aware that the market price of Boston Beer's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Boston Beer's securities at the artificially inflated prices, or at all.

204.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

205.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Boston Beer's securities during the Class Period.

## COUNT II

**(For Violations of §20(a) of the Exchange Act - against Individual Defendants)**

206.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

207.    The Individual Defendants acted as controlling persons of Boston Beer within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

208.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

209.    As set forth above, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

210.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

211.    **WHEREFORE**, on behalf of himself and the Class, Plaintiff prays for relief and judgment as follows:

(a) declaring this action to be a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b) Awarding damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: January 13, 2022                    Respectfully Submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*
Kim E. Miller (KM-6996)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
E-Mail: kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
E-Mail: lewis.kahn@ksfcounsel.com

*Counsel for Lead Plaintiff Ayhan Hassan and the Class*